UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GENERAL MOTORS CORPORATION, a Delaware corporation,<br><br>*Plaintiff*,<br><br>vs.<br><br>CADILLAC CITY, INC., a Massachusetts corporation,<br><br>*Defendant*. | CIVIL ACTION NO.<br>04-11926 REK |

## GM'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

INTRODUCTION

This is a quintessential case of cyberpiracy, trademark dilution, trademark infringement, and false designation of origin under the Lanham Act (15 U.S.C. §1051 et seq.), including the amendment to the Lanham Act known as the Anticybersquatting Consumer Protection Act. Defendant Cadillac City, Inc. (hereinafter "Defendant") is violating the trademark rights of plaintiff General Motors ("GM") by, among other things, (1) misappropriating GM's world-famous trademark CADILLAC® in the Internet domain name CADILLACCITY.COM where Defendant operates a website, (2) misappropriating GM's world-famous trademark CADILLAC® in Defendant's business name "Cadillac City, Inc." and in Defendant's logo as depicted below, and (3) using a logo that is a counterfeit of and confusingly similar to the world-famous CADILLAC LOGO® as depicted below:

| | |
|---|---|
| GM's USPTO Registration Nos. 1570808 and 1745650 |  |
| Defendant's Logo that knockoffs GM's CADILLAC LOGO® | |
| Defendant's signage that violates GM's trademark rights | |

In its Verified Complaint, GM alleges claims for cyberpiracy, federal trademark dilution, federal trademark infringement, and false designation of origin or sponsorship under Sections 43(d), 43(c), 32(1), and 43(a) of the United States Trademark Act of 1946, as amended (the

"Lanham Act"), 15 U.S.C. §§ 1125(d), 1125(c), 1114(1) and 1125(a), and trademark infringement under common law.

## FACTUAL BACKGROUND

The following facts have been established by the Verified Complaint and the Exhibits attached thereto. For the convenience of the Court, the numbered paragraphs set forth below are the same as the numbered paragraphs in the Verified Complaint, and the Exhibits to the Verified Complaint are also attached hereto:

### *The Parties*

6. Plaintiff GM is a Delaware corporation with its principal place of business in Detroit, Michigan.

7. Defendant Cadillac City, Inc. is a Massachusetts corporation with its principal place of business at 186 Monsignor O'Brien Highway, Cambridge, MA 02141. Defendant operates an automobile dealership at this address. Defendant is also the registrant of the domain name CADILLACCITY.COM.

### *GM's Trademarks*

8. For many years, GM has used the famous and registered trademarks CADILLAC® and the CADILLAC LOGO® in connection with GM's world famous and high quality automobile products and services. GM has obtained from the United States Patent and Trademark Office several trademark registrations for the trademark CADILLAC®, including US Registration Nos. 0201694, 0647241, 1700662, 1900372, 1665834, 1663465, 1664137, 1682999, 1660237, 1681292, 1711662, 1834568, 1782739, 2654530, and the CADILLAC LOGO®, including US Registration Nos. 1570808 and 1745650. Representative copies of GM's

trademark registrations are attached hereto as Exhibit A. These registrations are valid, unrevoked, subsisting, and incontestible, and constitute *prima facie* evidence of GM's exclusive ownership of the trademarks CADILLAC® and the CADILLAC LOGO® (hereinafter the "GM Trademarks").

9. GM has used the GM Trademarks since long before the acts of Defendant complained of herein. GM has spent hundreds of millions of dollars and has expended significant effort in advertising, promoting, and developing the GM Trademarks throughout the United States and the world. As a result of such advertising and expenditures, GM has established considerable goodwill in the GM Trademarks. The GM Trademarks have become widely known and recognized throughout the world as symbols of high quality, reliable automobile products and services. The GM Trademarks are famous and distinctive, and have come to be associated by the consuming public exclusively with the products marketed by GM. The GM Trademarks are invaluable assets of substantial and inestimable worth to GM.

10. GM itself operates a website at CADILLAC.COM where GM advertises its line of Cadillac® vehicles, products, and services. A true and correct copy of GM's website at CADILLAC.COM is attached hereto as Exhibit B.

### *Defendant's Violations of GM's Trademark Rights*

11. GM discovered in May 2004 that Defendant is in the business of operating an automobile dealership at 186 Monsignor O'Brien Highway, Cambridge, MA 02141. In operating this dealership and in advertising its sale of automobiles and services, Defendant is violating GM's trademark rights by, among other things, (1) misappropriating GM's world-famous trademark CADILLAC® in the Internet domain name CADILLACCITY.COM where

Defendant operates a website, (2) misappropriating GM's world-famous trademark CADILLAC® in Defendant's business name "Cadillac City, Inc." and in Defendant's logo, and (3) using a logo that is a counterfeit of and confusingly similar to the world-famous CADILLAC LOGO®. A true and correct copy of Defendant's website at CADILLACCITY.COM is attached hereto as Exhibit C. A true and correct copy of the WHOIS information demonstrating that Defendant is the registrant of CADILLACCITY.COM is attached hereto as Exhibit D. True and correct copies of photographs taken on May 19, 2004 of Defendant's automobile dealership and signage misappropriating both the trademark CADILLAC® and the CADILLAC LOGO® are attached hereto as Exhibit E.

12. Defendant is not in any way affiliated with, authorized, or sponsored by GM and has no authority to use the GM Trademarks. Despite its lack of affiliation, authorization, or sponsorship, Defendant unlawfully uses the GM Trademarks Marks as alleged above.

13. Immediately after GM discovered Defendant's violations of GM's trademark rights, GM sent a cease and desist letter to Defendant on or about May 25, 2004. A true and correct copy of this cease and desist letter is attached hereto as Exhibit F. For the next few months, GM and Defendant attempted to resolve this matter without litigation. Defendant, however, refuses to cease and desist from Defendant's violations of the GM Trademarks, and have forced GM to file this lawsuit.

14. Defendant's misappropriation of the GM Trademarks constitutes a misappropriation of the GM Trademarks and associated good will, and is likely to cause potential purchasers of Defendant's products and services, as well as the public at large, to believe that Defendant's services and products are affiliated with, authorized, sponsored by, or endorsed by

GM. In addition, Defendant's wrongful use of the GM Trademarks dilutes, tarnishes, and whittles away the distinctiveness of the GM Trademarks. Defendant's conduct is intentionally fraudulent, malicious, willful, and wanton. Accordingly, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

## ARGUMENT

"A party seeking a preliminary injunction must establish that (1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is 'a significant risk of irreparable harm'; (3) the balance of hardships weighs in its favor; and (4) the injunction will not harm the public interest." I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) (citation omitted).

"In the trademark context, 'irreparable harm may be shown even in the absence of actual injury to plaintiff's business based on plaintiff's demonstration of a likelihood of success on the merits on its claim.'" Id. (quoting Calamari Fisheries, Inc. v. The Village Catch, Inc., 698 F.Supp. 994, 1013 (D.Mass. 1988)). Indeed, preliminary injunctive relief is routinely granted in trademark cases on the basis of the important presumption that consumer confusion creates irreparable harm to the goodwill and reputation of the trademark owner. See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 939 (4th Cir. 1995) ("[W]e recognize that irreparable injury regularly follows from trademark infringement."). In recent years, this standard has been applied to sustain preliminary injunctive relief in the field of Internet domain name disputes. E.g., Northern Light Technology v. Nothern Lights Club, 97 F.Supp.2d 96 (D.Mass. 2000) (granting preliminary injunction regarding NORTHERNLIGHTS.COM); Ford Motor Co. v. Lapertosa, 126 F. Supp.2d 463 (E.D. Mich.

2000) (preliminarily enjoining misappropriation of FORDRECALLS.COM and transferring domain name to Ford); Green Products Co. v. Independence Corn By-Products Co., 992 F. Supp. 1070, 1080 (N.D.Iowa 1997) (preliminarily enjoining defendant's use of the domain name GREENPRODUCTS.COM); Minnesota Mining and Manufacturing Co. v. Taylor, 21 F. Supp.2d 1003, 1005 (D. Minn. 1998) (preliminarily enjoining defendant's use of the domain name POSTIT.COM).

## I. GM IS HIGHLY LIKELY TO SUCCEED ON THE MERITS.

For the reasons set forth below, GM is highly likely to succeed on the merits of its claims for (a) trademark infringement and false designation of origin or sponsorship; (b) trademark dilution; and (c) trademark cyberpiracy.

### A. GM is Highly Likely to Succeed on its Trademark Infringement Claim.

The essential elements of GM's claim for federal trademark infringement are (1) that Defendant has used in commerce a reproduction, counterfeit, copy, or colorable imitation of registered marks in connection with the sale, offering for sale, distribution or advertising of goods or services (2) which is likely to cause confusion, or to cause mistake, or to deceive. See 15 U.S.C. § 1114(1)(a). GM's claim for false designation of origin or sponsorship requires similar proof of likelihood of confusion "as to the affiliation, connection, or association" of Defendant with GM, or "as to the origin, sponsorship, or approval" of Defendant's products or services by GM. See 15 U.S.C. § 1125(a)(1).

In fact, likelihood of confusion is the touchstone of GM's federal trademark infringement and unfair competition claims under the Lanham Act. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768-69 (1992).

GM's preliminary showing of the likelihood of confusion is compelling. Even at this early stage, it is clear that GM will be able to establish that consumers will likely be confused by Defendant's (1) misappropriating GM's world-famous trademark CADILLAC® in the Internet domain name CADILLACCITY.COM where Defendant operates a website, (2) misappropriating GM's world-famous trademark CADILLAC® in Defendant's business name "Cadillac City, Inc." and in Defendant's logo, and (3) using a logo that is a counterfeit of and confusingly similar to the world-famous CADILLAC LOGO®.

Indeed, in a virtually identical case, General Motors v. E-Publications, where defendants were misappropriating the GM Trademarks in both a business and Internet domain name, and where defendants were using the GM Logo®, GM obtained a Final Judgment that made clear that such misappropriation of the GM Trademarks constituted trademark infringement:

> An automobile manufacturer has the right to prohibit the use of its trademarks in the business name of a business providing parts and/or services for its automobiles such as the business names "Restore GM" and "Restore GM Muscle." See Porsche Cars North America, Inc. v. Manny's Porshop, Inc., 972 F. Supp. 1128 (N.D. Ill. 1997) (enjoining use of the name "Porshop" in name of automobile repair shop specializing in repair of Porsche cars); Volkswagenwerk A.G. v. Brewer, 170 U.S.P.Q. 560 (D. Ariz. 1971) (enjoining use of term "Volkscity Service Center" in name of repair shop specializing in servicing Volkswagens); Volkswagenwerk A.G. v. Karadizian, 170 U.S.P.Q. 565 (C.D.Cal. 1971) (enjoining use of the name "Volkswagen Village" on used car outlet, despite the fact that defendant used a disclaimer stating "Used cars only; not a franchised Volkswagen dealer"); Ford Motor Co. v. Helms, 25 F. Supp. 698 (E.D.N.Y. 1938) (enjoining use of the trademark "Ford" on signage of independent dealer); Ford Motor Co. v. Benjamin E. Boone, Inc., 244 F. 335 (9th Cir. 1917) (enjoining use of the name "Ford Auto Agency" on signage of independent dealer). "[C]ourts have repeatedly held ... repair shops to
> be guilty of trademark infringement or unfair competition where ... such establishments use or imitate the manufacturer's name or mark in their trade names," Porsche Cars, 972 F. Supp. 1128, 1131 (quoting Dr. Ing. h.c.F. Porsche AG v. Zim, 481 F.Supp. 1247, 1250 (N.D.Tex.1979)), because consumers naturally assume that the independent shop is affiliated with or somehow sponsored by the manufacturer. Here, consumers will assume that a business that uses the GM Marks in offering parts and services for GM automobiles is affiliated with or sponsored by GM.

Moreover, [Defendant's] use of a script and logo that is confusingly similar to the script used by GM further violates GM's trademark rights. One may not use the distinctive script of a trademark holder. Porsche Cars North America, Inc. v. Manny's Porshop, Inc., 972 F.Supp. 1128, 1130-32 (N.D.Ill. 1997) (enjoining defendant from using Porsche's stylized script in signage, advertisements, and otherwise). Courts consistently have held that "the use of another's style or script constitutes presumptive evidence of deliberate copying and an intent to confuse." Id. at 1132.

In addition, [Defendant's] use of the Internet domain names RESTOREGM.COM and RESTOREGMMUSCLE.COM violates GM's trademark rights. Courts consistently have held that a defendant violates a plaintiff's trademark in registering a domain name that incorporates the plaintiff's famous mark, particularly where the defendant has no intellectual property rights in the mark and the defendant offers the same products or services offered by the plaintiff trademark holder. E.g., Harrods Limited v. Sixty Internet Domain Names, --F.Supp.--, 2001 WL 739885 (E.D.Va. June 27, 2001) (holding that variations of domain names using the trademark HARRODS do "not diminish the similarity of the defendant Domain Names to the HARRODS mark" and "noting that among the various forms of cybersquatting is the registration of 'another's mark or name as part of a domain name, such as "dellspareparts.com" for a business selling spare parts for Dell computers") (quoting Steven R. Borgman, The New Federal Cybersquatting Laws, 8 Tex.Intell.Prop.L.J. 265, 266 (2000)). See also, Washington Speakers Bureau v. Leading Authorities, 33 F.Supp.2d 488, 499 (E.D. Va. 1999); Green Products v. Independence Corn By-Products, 992 F. Supp. 1070 (N.D. Iowa 1997). Under such circumstances, the consumer confusion noted by the courts arises from the fact that "a domain name is more than a mere internet address"; it "identifies the internet site to those who reach it, much like . . . a company's name identifies a specific company." Cardservice International, Inc. v. McGee, 950 F.Supp. 737, 741 (E.D.Va. 1997), aff'd, 129 F.3d 1258 (4th Cir. 1997). A domain name is analogous to a billboard on the information superhighway or an indexed listing in a telephone directory. As noted in detail above, the law is well-settled that Defendant could not list itself under "GM" in a telephone directory or use the trademark "GM" on a billboard in such a way as to suggest affiliation with or sponsorship by GM. See Porsche Cars North America v. Manny's Porshop, 972 F. Supp. 1128, 1129 (N.D. Ill. 1997) (holding that defendant's use of the name "Manny's Porshop" on his signage, business name, and telephone listing constituted infringement and dilution, despite the fact that defendant was in the business of servicing Porsche automobiles); American Airlines, Inc. v. A 1-800-A-M-E-R-I-C-A-N Corp., 622 F. Supp. 673 (N.D. Ill. 1985) (holding that defendant's use of telephone number 1-800-AMERICAN constituted infringement of American Airlines' trademark even though defendant sold American Airlines tickets).

Accordingly, [Defendant's] use of the GM Marks is likely to cause potential purchasers of [Defendant's] products and services, as well as the public at large, to believe that [Defendant's] services and products are affiliated with, authorized, sponsored

by, or endorsed by GM.

General Motors v. E-Publications, 2001 WL 1798648, *2-3 (E.D.Mich 2001). The E-Publications case is consistent with the law of the First Circuit and this Court regarding both trademark infringement in business names and in domain names. E.g., Volkswagenwerk v. Aktiengesellschaft, 814 F.2d 812, 817 (1st Cir. 1987) (holding that automobile repair shops use of "The Beetle Barn" infringed VW's trademark "Beetle"); Star Financial Services, Inc. v. Asstar Mortgage Corp., 89 F.3d 5, 10 (1st Cir. 1996) ("STAR MORTGAGE" confusingly similar to "AASTAR MORTGAGE"); Equine Technologies, Inc. v. Equitechnology, Inc., 68 F.3d 542, 546 (1st Cir. 1995) ("EQUINE TECHNOLOGIES" confusingly similar to "EQUITECHNOLOGIES"); CCBN.com, Inc. v. c-call.com, Inc., 73 F.Supp.2d 106, 112 (D.Mass. 1999) ("StreetEvents.com confusingly similar to "StreetFusion.com").

Moreover, this First Circuit has made clear that when an infringer intentionally copies a trademark holder's trademark, (as is the situation here where Defendant has intentionally and precisely copied GM's CADILLAC LOGO® trademark and stylized script), a likelihood of confusion is presumed as a matter of law and an injunction should issue:

> But when a manufacturer intentionally uses another's mark as a means of establishing a link in consumers' minds with the other's enterprise, and directly profits from that link, there is an unmistakable aura of deception. Such a use is, by its very nature, "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Unless the defendant can show that there is in fact no likelihood of such confusion or deception about the product's connection to the trademark holder, such a use can be enjoined.

Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 35 (1st Cir. 1989).

**B.   GM is Highly Likely to Succeed on its Dilution Claim.**

In order to succeed on its claims for trademark dilution, GM "need only show the mark is

famous and defendants' use is likely to cause dilution." Porsche Cars North America v. Manny's Porshop, 972 F. Supp. 1128, 1132 (N.D. Ill. 1997). GM is highly likely to succeed in establishing these two elements. GM has spent hundreds of millions of dollars in advertising and marketing the GM Trademarks, and there can be no doubt that the GM Trademarks are some of the most famous marks in the world. Indeed, the GM Trademarks are the prototypically "famous" marks that Congress had in mind when it expanded federal trademark protection to encompass protection from dilution. See Michael Caruso & Co., Inc., v. Estefan Enterprises, Inc., 994 F. Supp. 1454, 1463 (S.D. Fla. 1998) (concluding that Congress intended to protect from dilution marks that "rise to the level of 'Buick' or 'Kodak.'"), aff'd 166 F.3d 353 (11th Cir. 1998).

Similarly, GM is highly likely to establish a likelihood of dilution of its trademarks. At a minimum, Defendants' use of the GM Trademarks gives rise to the possibility of dilution by "blurring"—in that it weakens "[t]he unique and distinctive significance of the mark to identify and distinguish one source," even if "no confusion as to source, sponsorship, affiliation or connection has occurred." McCarthy § 24:68. Indeed, [t]here is no requirement under the Act that plaintiffs show a likelihood of confusion," and "the Act prohibits even innocuous use." Manny's Porshop, 972 F.Supp. at 1132.

Moreover, courts have uniformly held that the use of world-famous trademarks in Internet domain names constitutes trademark dilution. E.g., Ford Motor Co. v. Lapertosa, 126 F. Supp.2d 463 (E.D. Mich. 2000) (holding that FORDRECALLS.COM is "dilutive" of the trademark Ford®); Playboy Enterprises v. Global Site Designs, 1999 WL 311707 (S.D.Fla. 1999) (preliminarily enjoining use of Internet domain names PLAYBOYONLINE.NET and PLAYMATESEARCH.NET because such domain names constitute trademark dilution); Playboy

Enterprises. v. AsiaFocus Int'l, Inc., 1998 WL 724000 (E.D.Va. April 10, 1998) (enjoining defendants use of domain names "asianplaymates.com" and "playmatesasian.com" and holding that such domain names and metatags diluted plaintiff's rights in famous "Playboy" and "Playmate" marks). As explained in General Motors v. E-Publications, 2001 WL 1798648, *3 (E.D.Mich 2001):

> Finally, [Defendant's] use of the GM Marks also dilutes the distinctive quality of the GM Marks. Dilution is the "lessening of the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1125(c). See Ford Motor, 103 F.Supp.2d at 1129. Because GM has spent hundreds of millions of dollars in advertising and marketing the GM Marks, there can be no doubt that the trademark GM® is one of the most famous marks in the world. Indeed, the trademark GM® is one of the prototypically "famous" marks that Congress had in mind when it expanded federal trademark protection to encompass protection from dilution. See Michael Caruso & Co., Inc., v. Estefan Enterprises, Inc., 994 F. Supp. 1454, 1463 (S.D. Fla. 1998) (concluding that Congress intended to protect from dilution marks that "rise to the level of 'Buick' or 'Kodak.'"), aff'd 166 F.3d 353 (11th Cir. 1998).

Thus, GM is also highly likely to succeed on its claim for trademark dilution arising out of Defendant's use of the business name "Cadillac City" and Defendant's use of the Internet domain name CADILLACCITY.COM.

### C.  GM is Highly Likely to Succeed on its Cyberpiracy Claim.

Section 3002 of the ACPA provides as follows:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person -
> (i) has **a bad faith intent to profit** from that mark . . .; and
> (ii) **registers**, traffics in, or **uses** a domain name that -
> . . .
> (II) in the case of a **famous mark** that is famous at the time of registration of the domain name, **is identical or confusingly similar to or dilutive of that mark**.

15 U.S.C. § 1125(d) (emphasis added).

GM is highly likely to succeed in establishing each of these elements. For the reasons set

forth above, GM will easily establish that the GM Trademarks are famous and that Defendant's use of the Internet domain name CADILLACCITY.COM is "identical or confusingly similar to or dilutive of that mark." Moreover, the above discussion also demonstrates Defendant's bad faith intent to profit from the GM Trademarks. Defendant's obvious intent is to use the goodwill associated with the GM Trademarks to draw Internet users to its website, hoping that Internet users will be lured by the false impression that the site is endorsed or approved by GM. As the courts have recognized, such a showing is sufficient to establish bad faith under the ACPA. See, e.g., Sporty's Farm, L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 498 (2nd Cir. 2000). Indeed, in an analogous situation, this Court granted a preliminary injunction based upon the defendant's registration of a domain name similar to plaintiff's domain name. Northern Light Technology v. Northern Lights Club, 97 F.Supp.2d 96, 120 (granting preliminary injunction because "Plaintiff will succeed on the merits of its Anticybersquatting claim").

## II.   A PRELIMINARY INJUNCTION IS NECESSARY TO AVOID IRREPARABLE HARM TO GM.

Courts have long adopted a presumption that irreparable injury "follows as a matter of course" from the infringement or dilution of valuable trademark rights. Opticians Ass'n of America v. Independent Opticians of America, 920 F.2d 187, 196 (3rd Cir. 1990); Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987). As the First Circuit has noted, "trademark infringement ordinarily causes intangible injuries which make injunctive relief appropriate." Boston Athletic Ass'n, 867 F.2d at 26.

The presumption of irreparable injury is appropriate here. If Defendant were permitted to continue misappropriating the GM Trademarks, GM would suffer irreparable damage to its goodwill and reputation by the loss of control over its trademarks. As another court held in a

very similar context:

> In the context of trademark litigation, "grounds for **irreparable harm** include loss of control of reputation, loss of trade, and loss of goodwill," regardless of whether the infringer is putting the mark to a good or favorable use. *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992). Liquid Glass's unauthorized use of the Porsche marks inhibits Porsche's ability to control which products its reputation and good will are being used to promote or endorse. This lack of control and potential damage to Porsche's reputation **constitutes irreparable injury** because monetary damages cannot adequately compensate for harm to good will or reputation.

Liquid Glass Enterprises v. Dr. Ing. h.c.F. Porsche AG, 8 F.Supp.2d 398, 406 (D.N.J. 1998) (emphasis added). In other words, GM's "lack of ability to control the nature and quality of services provided under an infringing . . . mark, even if defendant matches the high quality of plaintiff's services, constitutes irreparable injury." Fotomat Corp. v. Photo Drive-Thru, Inc., 425 F. Supp. 693, 711 (D.N.J. 1977).

Indeed, this analysis has been applied in cases of cyberpiracy to sustain a presumption of irreparable harm where a defendant uses a plaintiff's trademark in an Internet domain name address. See Green Products, 992 F. Supp. at 1080 (holding "that it would cause [plaintiff Green Products Co.] irreparable harm if [defendant] were allowed to retain ownership of the domain name 'greenproducts.com' during the pendency of the litigation"); Minnesota Mining, 21 F. Supp.2d at 1005 (finding that plaintiff 3M would suffer irreparable harm from defendant's registration of domain name "POSTIT.COM" and noting that such harm should be inferred "'as a matter of law'") (quoting S & R Corp. v Jiffy Lube Int'l, Inc., 968 F.2d 371, 378 (3rd Cir. 1992).

Because of the inherent difficulty of placing a value on the damage to such intangibles as the goodwill or reputation of a business, courts routinely grant injunctions in trademark actions. See, e.g., Aveda Corp. v. Evita Marketing, Inc., 706 F. Supp. 1419, 1431 (D. Minn. 1989) ("Any

hardship caused by the preliminary injunction may justly fall on the parties which consciously decided to dress their goods for the market in a manner 'so near to [a] successful rival that the public may fail to distinguish between them.'").

Moreover, "in the trademark context, 'irreparable harm may be shown even in the absence of actual injury to [GM's] business based on [GM's] demonstration of a likelihood of success on the merits of its claim.'" Northern Lights, 97 F.Supp.2d at 121 (quoting I.P. Lund Trading v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998)).

### III. THE BALANCE OF HARDSHIPS TIPS DECIDELY IN GM'S FAVOR.

Under these circumstances, the balance of hardships tips decidedly in GM's favor. While the injury to GM is immeasurable and irreparable, the only "harm" to Defendant will be an injunction against its attempts to misappropriate the GM Trademarks by using its goodwill to draw consumers to Defendant's website and place of business, and otherwise confuse consumers. No legitimate purpose is served by this misappropriation of the GM Trademarks, and no cognizable injury will result. See Minnesota Mining, 21 F. Supp.2d at 1005 (finding that a preliminary injunction against defendant's misappropriation of the "POSTIT.COM" domain name would not cause "any harm" to the defendant).

GM's injury is monumental and incalculable by comparison. GM has invested substantial sums in the world-wide development of its valuable trademarks and marketing of its automobiles and related products, and Defendant's violation of GM's trademark rights poses an immeasurable threat to GM's goodwill. See Green Products, 992 F. Supp. at 1080-81 (finding that any harm to the defendant associated with a preliminary injunction against its misappropriation of the plaintiff's trademark in its domain name is far less "extensive and

severe" than the harm that would otherwise be suffered by the plaintiff); Minnesota Mining, 21 F. Supp.2d at 1005 (finding that "the balance of harms weighs in favor of" preliminarily enjoining defendant's misappropriation of the POSTIT.COM domain name).

To the extent there is any risk of harm to Defendant, such harm is easily calculable and cannot be deemed irreparable. At most, Defendant's losses (if any) from the injunction sought by GM would be a loss of revenues. Where any "potential losses to the defendant are easily calculable," the balance of hardships tips strongly in the plaintiff's favor. See Heinz v. Frank Lloyd Wright Foundation, 1986 WL 5996, 229 U.S.P.Q. 201, 210 (W.D. Wis. 1986) (plaintiff's loss of goodwill not quantifiable, and therefore outweighs defendant's loss of sales which can be calculated).

Moreover, the law is well settled that a preliminary injunction is particularly appropriate where a defendant has used a trademark after objection by the trademark holder. E.g., Triangle Publications, Inc. v. Standard Plastic Products, Inc., 241 F. Supp. 613, 618-20 (E.D. Pa. 1965) (preliminary injunction appropriate where defendant continued its deceptive conduct after plaintiff's objection had been communicated to defendant).

## IV. THE PUBLIC INTEREST WILL BE ADVANCED BY A PRELIMINARY INJUNCTION.

Finally, the public interest also favors entry of a preliminary injunction in this case because the "[t]he public has an interest in the protection of trademarks and trade names," Hyatt Corp. Operation v. Hyatt Legal Services, 736 F.2d 1153, 1159 (7th Cir. 1984), and in "preventing consumer confusion and fraud," Paisa, Inc. v. N & G Auto, Inc., 928 F. Supp. 1009, 1013 (C.D. Cal. 1996). As Judge Barry noted in a very similar case: "Furthermore, public interest, in a

trademark case, is defined as 'the right of the public not to be deceived or confused.' Here, the public would be well served by a preliminary injunction." Liquid Glass, 8 F.Supp.2d at 407 (citation omitted). Moreover, in the public interest is served by avoiding confusion on the Internet. Green Products, 992 F. Supp. at 1081 (holding that a preliminary injunction against a defendant's misappropriation of plaintiff's trademark in a domain name advances the public interest); Minnesota Mining, 21 F. Supp.2d 1003, 1005 (finding that the Internet "has the potential to benefit hundreds of millions of people" and there is a "strong public interest in stopping . . . misuses of this new technology").

As the First Circuit has made clear:

> Finally, this court is mindful of the importance of and the need to protect trademarks from infringement. The use of trademarks is designed to alert the consuming public as to the origin and source of the products. It allows the public to depend on the constancy of the quality of the products it seeks.

Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 820 (1st Cir. 1987).

## CONCLUSION

For the foregoing reasons, the Court should grant a preliminary injunction enjoining Defendant from: (1) misappropriating the world-famous trademark CADILLAC® in the Internet domain name CADILLACCITY.COM, (2) misappropriating the world-famous trademark CADILLAC® in Defendant's business name "Cadillac City, Inc." and in Defendant's logo, and (3) using a logo that is a counterfeit of and confusingly similar to the world-famous CADILLAC LOGO®.

Dated: SEPTEMBER 2, 2004

BANNER & WITCOFF
Peter D. McDermott (BBO # 330760)
Thomas P. McNulty (BBO # 654564)
28 State Street
28th Floor
Boston, MA 02109
Telephone: (617) 720-9600

HOWARD, PHILLIPS & ANDERSEN
Gregory D. Phillips
560 E. 200 South, Suite 300
Salt Lake City, Utah 84102
Telephone: (801) 366-7471

*Of Counsel:*

CHARLES H. ELLERBROCK
**GENERAL MOTORS CORPORATION**
300 Renaissance Center
Detroit, Michigan 48265-3000
(313) 665-4709

## CERTIFICATE OF SERVICE

I certify that a true copy of the foregoing document was served by forwarding a copy to the process server for service with the verified complaint.

Date: SEPT. 2, 2004