UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

2004 OCT 25 A 11: 27

U.S. DISTRICT COURT
DISTRICT OF MASS.

|  |  |
|---|---|
| GENERAL MOTORS CORPORATION, a Delaware corporation, | ) ) ) CIVIL ACTION NO. 04 cv 11926 REK |
| *Plaintiff,* | ) ) ) |
| vs. | ) ) ) |
| CADILLAC CITY, INC., a Massachusetts corporation, | ) ) ) ) |
| *Defendant.* | ) ) |

### CADILLAC CITY, INC.'S MEMORANDUM IN OPPOSITION TO GENERAL MOTORS CORPORATION MOTION FOR PRELIMINARY INJUNCTION

#### INTRODUCTION

Cadillac City, Inc. opposes the Motion for Preliminary Injunction brought by General Motors Corporation based upon the facts set forth in the <u>Affidavit of Charles Karyanis in Opposition to General Motors Corporation's Motion for Preliminary Injunction</u> and the <u>Affidavit of Edward F. George, Jr. in Opposition to GM's Motion for Preliminary Injunction</u> and the defenses outlined in the <u>Answer (and Affirmative Defenses) of Cadillac City, Inc.</u> Moreover, Cadillac City, Inc. does not contest the jurisdiction of the Court pursuant to the Lanham Act (15 U.S.C. §1501 et seq.), but does contest the applicability of the amendment to the Lanham Act of the Anticybersquatting Consumer Protection Act to this case.

#### FACTUAL BACKGROUND

The detailed history of the used car dealership known and operated as "Cadillac City" and located at 186 Msgr. O'Brien Highway (Lechmere Square) in Cambridge, Massachusetts is set forth in the <u>Affidavit of Charles Karyanis in Opposition to General Motors Corporation's Motion for Preliminary Injunction</u> dated October 21, 2004 and filed herewith. Without repeating verbatim that Affidavit, it makes clear the fact that the Defendant corporation, Cadillac City, Inc. and its predecessors who operated the same used car business have been doing so under the public name "Cadillac City" since at least

1974 and probably since 1964. Mr. Karyanis purchased the business in 1974 from a Mr. Floyd Ford who indicated he had been operating it at the same location (with essentially the same "Cadillac City" signage on the office building as exists there today) since 1964. Mr. Karyanis operated the used car business as "Cadillac City" from 1974 to 1979 when he incorporated it and a year later in 1980 adopted the name by which the business was known to the public as the corporate name, i.e. "Cadillac City, Inc."

Mr. Karyanis also points out in his Affidavit that General Motors Corporation contacted him regarding the use of the name and the Cadillac "crest" in or about 1996, and the parties reached an understanding, to wit: Mr. Karyanis would sell the name "Cadillac City" to General Motors Corporation, General Motors Corporation was not interested, but wanted him to remove the Cadillac "crest" from his signs which he agreed to and did.

In the Affidavit, Mr. Karyanis states many other facts relevant to this inquiry, including that the registration of the internet domain name "CADILLACCITY.COM" was hardly any attempt at misappropriation, but merely the adaptation to the web of the same name used by his business since 1974 and by its predecessor since 1964. He also points out that over ninety percent (90%) of Cadillac City, Inc.'s business is the sale of multiple makes (brands) of used cars on a dealer-to-dealer basis.

Finally, as would be the case with any small privately held corporation, Mr. Karyanis' Affidavit makes it clear that the issuance of an injunction against the use of the name "Cadillac City, Inc." as an identifier with the business' established customers on any immediate or short term basis and without reasonable compensation would indeed do irreparable harm, not to General Motors Corporation (well known to this Court as one of the largest and most powerful corporations in the world), but to Cadillac City, Inc.'s long established business.

Counsel also submits his own Affidavit herewith regarding certain publicly available evidence of the use of the word "Cadillac" and attaching an advertisement from General Motors Corporation acknowledging the generally descriptive nature of the word "Cadillac".

## ARGUMENT

I. **SINCE "CADILLAC" IS BOTH AN HISTORICAL AND A GEOGRAPHICAL TERM IT IS ENTITLED TO A VERY NARROW PROTECTION AND PLAINTIFF CANNOT CLAIM THE RIGHT TO EXCLUSIVE USE.**

As a matter of propriety, counsel must immediately acknowledge that the very heading of this first argument is a direct quote from the decision of the U.S. District Court for the Western District of Michigan (General Motors Corporation's "home State") in General Motors Corporation v. Cadillac Marine & Boat Co., 226 F.Supp. 716, 725 (WD Mich. 1964). This Court's attention is respectfully directed to that landmark

2

decision for a number of reasons, including that Court's extensive description of the history of the word "Cadillac" at pages 723 and 724. Among the Court's more telling observations are the following:

> "The name Cadillac derives its historical origin from the explorer – soldier Antonie de Mothe Cadillac, who was born in 1660 and died in 1720...
>
> Long before Cadillac Motor Car Company and Cadillac Automobile Company appropriated the name 'Cadillac', individuals, corporations and copartnerships had adopted the name 'Cadillac' as the name in whole or in part of enterprises and of their products...
>
> As evidence of widespread common usage, an examination of the telephone directory of the City of Cadillac, of the City of Detroit, and other cities throughout Michigan and the middle west, will disclose that many businesses use 'Cadillac' as part of their name...
>
> Plaintiff has never been the exclusive user of the name 'Cadillac' or the Cadillac seal." (Id. at 723).

That Court's first and fundamental conclusion was that:

> "Therefore, the name 'Cadillac' as a trade-mark possesses the infirmities of a trade-mark which are characteristic of both a historical and geographic name." (Id. at 724).

and

> "The crest use by plaintiff has historical derivation. It likewise bears the infirmities due a historical name in the law of trademarks." Id.

If the observation of U.S. District Court for the Western District of Michigan is to be followed, Cadillac City, Inc. therefore gave up something of value in agreeing to remove from its signage the Cadillac "crest" during its negotiations with General Motors Corporation in 1996. (Affidavit of Charles Karyanis at paragraph 8).

While it may at first appear that the General Motors Corporation v. Cadillac Marine & Boat Co. decision is completely distinguishable by the implied divergence in the products offered for sale as between these two entities, such is in fact not the case. General Motors Corporation made the argument that they, too, "manufacture marine diesel engines". (Id. at 720). Indeed, the District court saw through General Motors Corporation's allegations that Cadillac Marine & Boat Co.'s use of the word Cadillac and

3

the so-called Cadillac crest confuses, misleads and deceives the public as to the origin of the goods sold by said Defendant and dismissed General Motors Corporation's hyper allegations that:

> "as a result of this use the defendant is guilty of fraudulent intent, actual or constructive, and should be enjoined from any further use of plaintiff's trade-mark 'Cadillac'." (Id. at 721)

Mr. Karyanis, the President of Cadillac City, Inc. points out in his Affidavit filed herein that

> Over ninety percent (90%) of car sales conducted by Cadillac City, Inc. are made over the phone on a dealer-to-dealer wholesale basis with other car dealers without any consumer involvement in the transactions. (Affidavit of Charles Karyanis at paragraph 12).

and

> Cadillac City, Inc. buys and sells multiple brands of pre-owned automobiles and most of these transactions involve makes (brands) other than Cadillacs. We sell a large number of Lexis, BMW, Audi, Volkswagen and other premium brands. In the early 1980's the number of used Cadillacs bought and sold by Cadillac City, Inc. diminished considerably because of increases in the price of gasoline. (Affidavit of Charles Karyanis at paragraph 12).

The absence of Cadillac automobiles offered for sale by Cadillac City, Inc. is evident in the photos offered by General Motors Corporation itself and attached to their pleadings at Exhibit "E". Essentially, General Motors Corporation has by its own photographic evidence put itself to the tasks of proving that:

(a)   in using the name "Cadillac City" the Defendant has attempted to trade on the alleged superior and more famous qualities of General Motors Corporation's automobiles in an attempt to peddle the inferior BMW's, Lexus and Audi vehicles populating the Defendant's used car lot.

(b)   the buying public driving past the lot who possess the financial ability to purchase such luxury vehicles are somehow confused and misled by the sign and therefore diverted for example from investing in a Fleetwood and into buying a BMW 3 Series.

(c)   the dilution of the alleged trade name "Cadillac" in connection with the sale of a vast number of products has somehow been increased by some significant degree beyond the monumental evidence detailed by the Court in Cadillac Marine and Boat Co. (Supra).

4

It is, however, respectfully suggested to this Court that the District Court in Michigan had it right when the Justices there noted:

> "Defendant's use of the name 'Cadillac' did not cause, and was not likely to cause, confusion or mistake, or to deceive purchasers as to the source or origin of their goods." (Id. at 742)

and

> "General Motors should not be permitted to reach out its strong, choking, monopolistic hand to strangulate industries or free enterprises located within the City of Cadillac, Michigan. The City of Pontiac, Michigan, the City of Euclid, Ohio, the communities of Seville in Florida, Georgia, Ohio or Spain, or the Towns of LaSalle in Colorado and Illinois, and the Village of LaSalle in France." (Id. at 741, 742).

Nor should General Motors Corporation be successful in their present attempt to strangulate this small family business located in Cambridge, Massachusetts, which has been selling used cars under the name "Cadillac City" since at least 1974.

## II.   GENERAL MOTORS CORPORATION'S CLAIMS ARE BARRED BY ESTOPPEL, ACQUIESCENCE, LACHES AND RELATED DOCTRINES

By claiming that "General Motors Corporation first discovered in May 2004 that Defendant is in the business of operating an automobile dealership at 186 Msgr. O'Brien Highway, Cambridge, Massachusetts" General Motors Corporation launches it bid for a pennant in this case by quickly alleging that the game begins with its fastest runner on third base and no outs. Such is not however, the factual status of the matter. Cadillac City, Inc. has been incorporated under that name since October of 1980 and the owner of the corporation has operated the used car business under the prominently displayed signage at that address since at least 1974 and his predecessor has operated it there since 1964 (Affidavit of Charles Karyanis at paragraphs 3, 4, 5) 186 Msgr. O'Brien Highway is in Lechmere Square several hundred yards before the Science Museum, on the sidewalk right hand side of the intersection into which the McGrath and O'Brien Highway empties thousands of commuters per day into the City of Boston, next door to the Lechmere T station.

Moreover, General Motors Corporation has a number of Cadillac new car dealers in the Greater Boston area. To allege or argue that for over a period of thirty (30) years Cadillac City, Inc. has been confusing the consumer customers of General Motors Corporation, thwarting the sales efforts of their authorized Cadillac dealers and diluting the reputation of both without General Motors Corporation's knowledge, actual or imputed, is at best an effort at wishful thinking.

Based on Mr. Karyanis' Affidavit alone, Cadillac City, Inc. is entitled to conduct discovery of General Motors Corporation to determine what the Plaintiff, according to its own records, knew and when. His business has been there at 186 Msgr. O'Brien Highway for over thirty (30) years. In addition to the signage at this used car lot, Mr. Karyanis' business has dealer licenses from the City of Cambridge, dealer plates from the Commonwealth, advertising including in the yellow pages, bank accounts, lines of credit and long-established phone messaging in the name of "Cadillac City, Inc." and all of this has been true since at least 1980 and before then (Affidavit of Charles Karyanis paragraph 11). Over ninety percent (90%) of the car sales conducted by Cadillac City, Inc. are made on the phone on a dealer-to-dealer wholesale basis with other car dealers. (Affidavit of Charles Karyanis paragraph 12). If he were to stop answering telephone calls with the name "Cadillac City" without an opportunity to advise the many dealers with whom he does business of a name change, he would suffer a significant loss of business (Affidavit of Charles Karyanis at paragraph 13).

As was stated in Bridgestone Firestone Research, Inc. v. Automobile Club De L'Ouest de la France:

> "Laches is principally a question of the inequity of permitting the claim to be enforced – an inequity founded upon some change in the condition or relations of the property and parties." Bridgestone Firestone Research, Inc. v. Automobile Club De L'Ouest de la France, 245 F.3d 1359, 1361(2001).

and

> "In determining whether a party has too long slept on its rights, it is necessary to show that the party knew or should have known that it had a right of action, yet did not act to assert or protect its rights." (Id. at 1361, 1362)

The Court in Bridgestone points out that:

> "Two general categories of prejudice may flow from an unreasonable delay: prejudice at trial due to loss of witnesses, and economic prejudice based on loss of time or money or forgone opportunity." (Id. at 1362)

In the case at bar, it clearly is true that if Cadillac City, Inc. knew back in 1980 or 1985 or 1990 or 1995 that its business name – the name by which its dealer-customers for its BMW's, Lexus, Audi and other premium make autos knew and identified it - would be in jeopardy in 2004, it could have and would have chosen another name under which to build its reputation. Yet, the only contact General Motors Corporation ever made with the Defendant prior to 2004 was a conversation with General Motors Corporation's Legal Department in 1996 in which they, in effect, lead Mr. Karyanis to believe they would leave him alone if only he would take down the Cadillac "crest", which he agreed to do and did, in essence constituting acquiescence by General Motors Corporation.

The connection between laches and estoppel was well stated in Kellog Co. v. Exxon Corp., wherein the Court pointed out that although laches precludes a plaintiff from recovering damages, in order to bar injunctive relief the defendant must prove the elements of estoppel – and in the case at bar, Cadillac City, Inc. respectfully submits that General Motors Corporation is estopped from obtaining an injunction as Cadillac City, Inc. has relied upon General Motors Corporation's inaction for over thirty (30) years to its significant detriment and prejudice. Kellog Co. v. Exxon Corp., 209 F.3d 562, 568 (C.A.6 2000).

See also, Brittingham v. Jenkins, 914 F.2d 447 (4th Cir. 1990) and Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455 (4th Cir. 1996). The Court in Sara Lee, relying on Brittingham, stated:

> "to the extent that a plaintiff's prior knowledge may give use to the defense of estoppel by laches, such knowledge must be of a pre-existing, infringing use of the mark. In other words when a defendant charged with trademark infringement avails itself of an acquiescence defense, we must presume the existence of some underlying infringement to which the plaintiff acquiesced, and any delay attributable to the plaintiff must be measured from the time at which the plaintiff knew or should have known that this infringement had ripened into a provable claim." Brittingham v. Jenkins, 81 F.3d 455, 462.

General Motors Corporation should have known well before 1996, clearly knew by then yet now seeks an injunction in 2004, at least eight (8) years or more probably thirty (30) years later.

Finally, as was stated in Elvis Presley Enter. V. Elvisly Yours, Inc.:

> "Acquiescence, like laches, requires a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." Elvis Presley Enter. V. Elvisly Yours, Inc., 936 F.2d 889, 894 (6th Cir. 1991).

General Motors Corporation's application for an Injunction should be denied, as this is the nature of the case at bar.

III. **THE USE OF THE NAME "CADILLAC CITY" BY THE DEFENDANT CORPORATION HAS NOT BEEN SHOWN TO CAUSE CONFUSION BY GENERAL MOTORS CORPORATION.**

The Sixth Circuit in Kellogg Company v. Exxon Corporation, referring back to Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., stated with reference to violations of the Lanham Act:

7

The touchstone of liability under §1114 is whether the defendants use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. When determining whether a likelihood of confusion exists, a court must examine and weigh the following eight factors:

1. strength of the mark.
2. relatedness of the goods or services.
3. similarity of the mark.
4. evidence of actual confusion.
5. marketing channels used.
6. likely degree of purchaser care.
7. the intent of the defendant in selecting the mark.
8. likelihood of expansion of the product lines.

<u>Kellogg Company v. Exxon Corporation, 209 F.3d 562, 568 (1999), citing Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr. 109 F.3d 275 (6th Cir. 1997).</u>

Although General Motors Corporation has alleged in its Verified Complaint all sorts of evil intent on the part of the Defendant, none of it is the actual case. First, as pointed out above with reference to the <u>Cadillac Marine and Boat Co.</u> case, the alleged trade mark is not really as strong as General Motors Corporation would have us believe. It is used by many business concerns for many products.

Second, the only relationship between the goods sold by General Motors Corporation and the goods sold by the Defendant is that they are automobiles. General Motors Corporation sells new Cadillacs. Surely its dealers sell used Cadillacs, but General Motors Corporation does not allege that it does so. Cadillac City, Inc. long ago sold a significant number of used Cadillacs, but it has not done so for years. Cadillac City, Inc. sells "a large number of Lexus, BMW, Audi, Volkswagen and other premium brands" (Affidavit of Charles Karyanis at paragraph 12).

Third, a quick review of the internet reveals that just about everyone using the name "Cadillac" does so in a similar fashion. This is true for Cadillac restaurants, liquor stores, even the "Cadillac Ranch" which shows old Cadillacs buried in the sand in Texas. (Affidavit of Edward F. George, Jr.)

Fourth, General Motors Corporation has shown absolutely no evidence of actual confusion. No surveys. No opinion polls. And, Mr. Karyanis has filed an Affidavit saying:

> "As can easily be seen from photographs attached to the Plaintiff's Complaint, none of the vehicles that we offer for sale (BMW, Lexus, Audi, Volkswagen) are disguised as Cadillacs. I have never known a consumer to come in and buy another brand of

automobile based on the misunderstanding that the car was manufactured or sold by General Motors Corporation." (Affidavit of Charles Karyanis at paragraph 14 under <u>My Comment</u> to paragraph 45 of Plaintiff's Verified Complaint).

Fifth, General Motors Corporation sells new Cadillacs to its consumers through its dealers. Cadillac City, Inc. sells mostly other brands of used cars to other dealers and deals with consumers less than 10% of the time. (Affidavit of Charles Karyanis at paragraph 12).

Sixth, the average purchaser of any of the products at issue is without doubt quite careful.

Seventh, actually Cadillac City, Inc. didn't really select its own name. Charles Karyanis bought a used car business from one Floyd Ford who operated it under the d/b/a "Cadillac City" in 1974. Mr. Ford had done so for the previous ten (10) years. Mr. Karyanis, in changing the name of the corporation he formed in 1979 from "Drive-A-Way, Inc." to "Cadillac City, Inc." was simply conforming the corporate name to the d/b/a he had used from 1974 to 1980 and that Mr. Ford, his predecessor, had used for ten (10) previous years. (Affidavit of Charles Karyanis at paragraphs 3,4, 5)

Eighth, there is no issue of "likelihood of expansion of the product lines" unless General Motors Corporation contemplates acquiring the Lexus, BMW, Audi or Volkswagon brands.

The First Circuit has adopted virtually an identical set of eight (8) guidelines in assessing the likelihood of confusion violating the Lanham Act in <u>Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.</u> 718 F.2d 1201 (1983). The Court in <u>Astra</u> has also clearly stated that if a likelihood of confusion exists, it must be based on the confusion of some relevant person, i.e. a customer or purchaser and that there is always less likelihood of confusion where goods are expensive and purchased after careful consideration.

In <u>The Beacon Mutual Insurance Company v. Onebeacon Insurance Group</u> No. 03-2671 (1st Cir. 07/12/2004), the First Circuit has recently expanded the 6th test recited in <u>Astra</u>, that of whether there is "evidence of actual confusion" and held:

> We join those courts holding that actual confusion is commercially relevant if the alleged infringer's use of the mark could inflict commercial injury in the form of …a diversion of sales, damages to goodwill, or loss of control over reputation on the trademark holder (citations omitted).

Nevertheless, the Beacon decision does go on to "consider the other factors commonly used in the eight-part test". It is interesting to note that in support of its lawsuit, Beacon Mutual:

9

> "submitted an affidavit by Michael Lynch, Vice President of legal services for Beacon Mutual stating that shortly after One Beacon's name change, Beacon Mutual began receiving misdirected e-mails, telephone calls, checks, and letters intended for One Beacon. Attorney Lynch attached to his affidavit an exhibit, entitled "The Confusion Matrix" that detailed 249 instances of confusion between Beacon Mutual and One Beacon between June 2001 and November 2002 based on Lynch's own personal knowledge and information in Beacon Mutual's business records."

The Court clearly relied on such evidence, at least in part, in reversing summary judgment under the Lanham Act which had initially been granted to One Beacon. No such evidence has been submitted in the case at bar by General Motors Corporation.

## IV.  IF THE OTHER USES OF THE ALLEGED 'CADILLAC' MARK HAVE NOT ALREADY DIMINISHED THE ALLEGED UNIQUENESS OF GENERAL MOTORS CORPORATION'S MARK, CADILLAC CITY, INC.'S USE OF IT WILL NOT DIMINISH IT EITHER.

As we have already noted above in the first argument the decision in General Motors Corporation v. Cadillac Marine & Boat Co. 226 F.Supp. 716 not only details at length the history and derivation of the word "Cadillac", but dispels any motion that General Motors Corporation has a claim to the name as its unique property.

General Motors Corporation states in its Memorandum that "there is no requirement under the Act that plaintiffs show a likelihood of confusion" (page 11) in arguing that: "General Motors Corporation is highly likely to succeed on its dilution claim" (page 10).

Such is simply not the case. In Victor Moseley and Cathy Moseley d/b/a Victor's Little Secret v. Secret Catalogue, Inc. et al 537 U.S. 418, 123 S.Ct. 1115 (2003) the U.S. Supreme Court unanimously held that the 1995 amendment to Section 43 of the Trademark Act of 1946, 15 U.S.C. §1125, known as the Federal Trademark Dilution Act (FTDA) requires objective proof of actual injury to the economic value of an alleged famous mark (as opposed to a presumption of harm arising from a subjective "likelihood of dilution standard) as a requisite for relief under the FTDA. The Respondents in that case owned the trademark "Victoria's Secret" under which they sold women's lingerie in over 750 stores. The Appellants owned one store with a similar, though not identical, name called "Victor's Little Secret" which sold "tawdry merchandise".

The Court in Moseley (Victoria's Secret) held:

> "The record in this case establishes that an army officer who saw the advertisement of the opening of a store named "Victor's Secret" did make the mental association with "Victoria's Secret", but it also shows that he did not therefore form any different

10

>impression of the store that his wife and daughter had patronized. There is a complete absence of evidence of any lessening of the capacity of the Victoria's Secret mark to identify and distinguish goods or services sold in Victoria's Secret stores or advertised in its catalogs." (Id. at 434, 1125)

The Court went on to observe that:

>"It may well be, however, that direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can be reliably proven through circumstantial evidence – the obvious case is one where the junior and senior marks are identical. Whatever difficulties of proof may be entailed, they are not an acceptable reason for dispensing with proof of an essential element of a statutory violation." (Id. at 434, 1127)

In the case at bar, not only is "Cadillac City, Inc." not identical to General Motors Corporation's alleged trademark, the word "Cadillac" itself is by General Motors Corporation's very own definition a "diluted" term.

The Affidavit of Edward F. George, Jr. in Opposition to General Motors Corporation's Motion for Preliminary Injunction dated October 22, 2004 filed herewith attaches as **Exhibit "A"** nineteen (19) auto-related websites using the name "Cadillac" in their titles, the very first of these being "Ant Farm's Cadillac Ranch" and showing a number of Cadillac cars half buried in the Texas desert. The Affidavit attaches as **Exhibit "B"** and original 21" x 22" ad placed by General Motors Corporation in the USA Today newspaper last month picturing its new Cadillac STS and quoting the definition of "Cadillac" from Webster's Third New International Dictionary as **"something that is the most outstanding and prestigious of its kind"**.

Cadillac City, Inc. may or may not be the "most outstanding and prestigious" multi-brand used car dealership of its kind, but it is clearly not the only small auto-related business using the word "Cadillac" in its name.

While General Motors Corporation relies heavily on the case of Porsche Cars North America, Inc. et al v. Manny's Porshop, Inc. and cites their own effort in General Motors v. E-Publications, the fact is that "Porsche" and "G.M." were not alleged to be diluted terms in the auto or any other world. There is no "Porsche Mountain" in Acadia National Park or "Porsche, Michigan". (Cadillac Marine & Boat Co. supra). And the defendants in those cases were exclusively engaged in repair of Porsche and General Motors Corporation products.

Aside from all of that, General Motors Corporation has completely failed to produce any evidence of similarity resulting in confusion. As the Court held in Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc. 718 F.2d 1201:

"Finally, Astra argues that even though there are over 100 registrations of the mark 'Astra', its mark is unique and individual in the medical field and this uniqueness will suffer from Beckman's use of the mark.

If the other registrations and uses of the 'Astra' mark have not already diminished the uniqueness of Astra's mark, Beckman's use of it on its analyzers will not diminish it either." (Id. at 1210)

## CONCLUSION

"Cadillac" is a widely used term, even in the field of automobile parts and services. It is not unique to General Motors Corporation's cars. "Cadillac City" started out as the "d/b/a" as early as 1964 for the Defendant's small used car business in Cambridge, Massachusetts and Cadillac City, Inc. was formed as a corporation in 1979/1980 to carry on that business under the name "Cadillac City". For reasons having to do with the market place for automobiles (the first oil shortage in the early 1980's) the number of used Cadillacs sold by the business diminished considerably and the Corporation's sales consist mostly of other premium brands (Lexus, BMW, Audi, Volkswagen). Ninety percent (90%) of those sales are dealer-to-dealer and do not involve consumers. All of the autos sold by Cadillac City, Inc. are well marked as to make (brand). General Motors Corporation has proffered no evidence of actual confusion and no evidence of the dilution of its trade name for Cadillac automobiles. General Motors Corporation assumes confusion and dilution, even alleging that a small business selling used cars by phone to other predominately Massachusetts and New England dealers has caused confusion in the State of Michigan (paragraph 45 of General Motors Corporation's Verified Complaint and the Comment regarding same in paragraph 14 of the Affidavit of Charles Karyanis). There is no dilution. There is no confusion. There is no intended or actual violation of the Lanham Act by Cadillac City, Inc. and even if there had been such back in the 1970's when the business was purchased by its present owners, General Motors Corporation has long since lost its right to complain by waiting over thirty (30) years to file suit all to the prejudice of the Defendant.

CADILLAC CITY, INC.

Dated: _October 22, 2004_   By _[signature]_
Edward F. George, Jr., Esq. (BBO# 189160)
EDWARD GEORGE & ASSOCIATES
110 Florence Street, 2nd Floor
P.O. Box 393
Malden, MA 02148
Tel. #: 781-322-7575

12

## CERTIFICATE OF SERVICE

I, Edward F. George, Jr., counsel for the Defendant, Cadillac City, Inc. hereby certify that service of a true copy of the foregoing **Memorandum in Opposition to General Motors Corporation's Motion for Preliminary Injunction** has this day been made upon the Plaintiff, General Motors Corporation, by delivering copies thereof to its counsel of record, by Federal Express, as follows: Thomas P. McNulty, Esq. Banner & Witcoff, Ltd. 28 State Street, 28th Floor, Boston, MA. 02109 and to its co-counsel Gregory D. Phillips, Esq. Howard, Phillips & Andersen, 560 E., 200 S., Suite 300, Salt Lake City, Utah 84102.

Date  October 22, 2004                                  Edward F. George, Jr.